Rec'd 2/25/14
U.S. DISTRICT COURT E.D.N.Y. NM
★ FEB 24 2014 ☆

BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
JOHNATHAN BOSTON,

                              Petitioner,                    NOT FOR PUBLICATION
                                                            **MEMORANDUM & ORDER**
        - against -                                          10-CV-01494 (CBA)

WILLIAM BROWN, Superintendent of
Eastern Correctional Facility,

                              Respondent.
-------------------------------------------------------------------x
AMON, Chief United States District Judge.

Johnathan Boston, proceeding pro se, petitions this Court for a writ of habeas corpus

pursuant to 28 U.S.C. § 2254. He seeks to vacate his 2005 New York State conviction following

a jury trial in the Supreme Court of New York, Queens County for attempted robbery, criminal

possession of a weapon, and reckless endangerment. Boston challenges his conviction claiming

that (1) the trial court improperly granted the prosecution's reverse-Batson motion, (2) his

appellate counsel provided ineffective assistance by insufficiently challenging the Batson issue

on appeal, (3) he was denied his right to an impartial jury in light of the jury's racial animus

toward him and toward one juror, and (4) the sentencing court relied on improper information in

imposing his sentence. Boston also requests the appointment of counsel. For the reasons stated

below, Boston's request for the appointment of counsel and his habeas petition are both denied.

## BACKGROUND

### I. Trial, Conviction, and Sentencing

Boston, along with Lawrence Harris, was indicted and charged in Queens County with

two counts of attempted murder, two counts of attempted robbery, three counts of second-degree

criminal weapon possession and two counts of reckless endangerment. On July 19, 2005, Harris

1

pleaded guilty to second-degree attempted murder and was sentenced to a determinate six-year prison term. Boston chose to proceed to trial.

## A. Jury Selection

Jury selection commenced on October 27, 2005. (Tr.[1] 1.) During the first round of jury selection, fourteen prospective jurors were seated and one, after initial questioning from the court, was excused on consent and replaced. (Tr. 21-22.) After subsequent questioning by the court, the prosecutor and defense counsel, three additional prospective jurors were excused on consent. (Tr. 95-96.) The prosecution peremptorily challenged three prospective jurors, and the defense peremptorily challenged four prospective jurors. (Tr. 97-98.)

Claiming that "[a]ll of the individuals who were peremptorily challenged by the defense [were] white individuals," the prosecutor raised her first reverse-Batson challenge. (Tr. 98-99.) To make her prima facie showing, the prosecutor asserted that with the exception of one prospective juror, defense counsel had struck "every other Caucasian individual who was available to be stricken." (Tr. 99.) In response, defense counsel stated that one of the struck jurors, Leon Rabeno, had engaged in work involving some of the same risk factors as those in the underlying criminal charge. (Tr. 100.) Noting that "[n]umbers alone are not dispositive," the court determined that "a prima facie case of purposeful determination ha[d] not been established yet" but cautioned that he was "mindful of this concern now on the part of the People and w[ould] be following this very closely." (Id.) After excusing the challenged prospective jurors, the remaining four members of the panel were empaneled. (Tr. 103.)

The court then proceeded to a second round of jury selection, commencing again with fourteen prospective jurors. Due to health concerns, one prospective juror was excused on

[1] References to "Tr." denote the trial transcript, including the transcript of the voir dire proceedings. References to "S Tr." refer to the transcript of the sentencing proceedings.

consent and replaced. (Tr. 105.) Of the first thirteen members on the panel, four additional prospective jurors were excused for cause. (Tr. 200-13.) Considering this same group, the prosecution peremptorily challenged three prospective jurors, and the defense peremptorily challenged two prospective jurors. (Tr. 208, 213.)

Before turning to the remaining prospective juror, the prosecutor renewed her reverse-Batson challenge, claiming that "every single challenge exercised by the defense ha[d] been against Caucasians," which demonstrated "a clear pattern of discrimination based upon their ethnicity." (Tr. 213-16.) Defense counsel did not deny that his peremptory challenges had been exercised in this round against Caucasians but protested that "most of the prospective jurors are Caucasians. . . . I left two. I struck two. There's no prima facie case here. Come on." (Tr. 217.) "[I]n looking at raw numbers alone," however, the court agreed with the prosecution "that there [wa]s a concern here." (Tr. 217.) In addition to the two Caucasian jurors defense counsel had struck in the second round, the court pointed out that all four jurors that defense counsel had struck in the first round appeared to be Caucasian, including juror Eugene Arguelles, despite his "Hispanic name." (Id.)

Determining that a prima facie case of discrimination had been established, the court asked defense counsel to explain why he had struck the two jurors in the second round—Raymond Scacalossi and David Weber. With respect to Mr. Scacalossi, defense counsel noted "multiple thefts in his lifetime," that he is a high school math teacher and that he has two family members who are police officers. (Tr. 218.) When asked, in effort "to make sure we covered everything," whether Mr. Scacalossi "articulate[d] any bias at all regarding any of these issues", defense counsel responded in the negative. (Tr. 218-19.) Noting that defense counsel had declined to strike other jurors with similar characteristics, including individuals who were theft

3

or robbery victims and those with family and other close associations with police officers, the court determined that defense counsel's race-neutral reasons for striking Mr. Scacalossi were pretextual and he was seated as juror. (Tr. 219-223.) Turning to Mr. Weber, defense counsel noted that his nephew had just become a police officer and that, as a Department of Sanitation employee of the city, he had "that loyalty of all city employees in uniform." (Tr. 223-24.) Again pointing to the several unchallenged jurors with police ties and dismissing the existence of any loyalty between city employees in different uniforms, the court rejected these explanations as pretextual, and Mr. Weber was also seated as a juror. (Tr. 225.) Jury selection then resumed and a jury was selected without additional reverse-<u>Batson</u> challenges.

## B. Trial

### 1. The Prosecution's Case

Trial commenced on October 31, 2005. Robert Thomson and Joseph Zemaitis, co-owners of a small payroll company, testified that on the morning of September 4, 2004 they were making a regular payroll cash delivery to the Railex Corporation near 89th Street and Atlantic Avenue in Queens. (Tr. 383-84, 434.) When they arrived at their destination, they stated that shots were fired in their direction from a slow moving red van. (Tr. 385-86, 437.) Thomson testified further that two black individuals emerged from the van, one carrying a long weapon and the other a short weapon. Thomson noted that the individual carrying the long weapon was wearing a bandanna. (Tr. 389-90.) Thomson returned fire and the individual carrying the shorter weapon got back into the van, which began driving away, while the other individual chased after the van on foot. (Tr. 392.) This account was in part corroborated by a witness for the government who testified that while visiting a residence on the corner of 89th Street and Atlantic

4

Avenue on the morning of September 4, 2004, he heard two gun shots and then observed a black man running down Atlantic Avenue carrying a long gun. (Tr. 757-62.)

Police officer John Schaeffer also testified as to the events that occurred on the morning of September 4, 2004 in the vicinity of 89th Street and Atlantic Avenue. According to his account, while driving down Atlantic Avenue in a marked police car with two other officers inside, he observed a black male, whom he identified as Boston, with a bandanna around his neck carrying a rifle running down the median on Atlantic Avenue. (Tr. 322-24, 327.) As Shaeffer cut Boston off with his car, Boston threw his rifle at the car, hitting the windshield. (Tr. 326-27.) The officers apprehended him and placed him under arrest. (Tr. 329-30, 332.) Shaeffer recovered the rifle, the bandanna and some gloves from the immediate vicinity, and other officers found a shotgun and a 9 millimeter handgun in a red van parked across the street. (Tr. 329, 332.) When shown the recovered bandanna shortly after the incident, Thomson stated that it appeared to be the same as the one worn by his assailant with the long gun. (Tr. 374-75.)

2. The Defense's Case

Boston and his mother, Doris Chavis, both testified as defense witnesses. Chavis testified that at the time of the events in question she, Boston, and her husband lived one block from the corner of 92nd Street and Atlantic Avenue. (Tr. 821, 823.) She stated further that, although she had been in the hospital during the events at issue, she had never seen the bandanna, a rifle, or the hat recovered from Boston in her son's room. (Tr. 821, 824-25.)

Boston testified that he was nineteen years old at the time of the incident and confirmed that he was living with his mother near the corner of 92nd Street and Atlantic Avenue. (Tr. 832.) He testified further that on the morning of September 9, 2004, he left his house to go to his sister's house in Brooklyn, planning to take the bus that stopped at the corner of 92nd Street and

5

Atlantic Avenue. (Tr. 835-36.) As he was walking along Atlantic Avenue from 91st Street

toward the stop on 92nd Street, he observed a rifle on the ground in the street. (Tr. 838.) After

he walked past the rifle a police car came up the sidewalk and hit him lightly, knocking him to

the ground. (Tr. 839.) The officers then arrested him. (Tr. 840, 842.) He testified that he was

not wearing a hat, a bandanna, or gloves that day and that the first time he saw either the hat or

the bandanna was at the beginning of the trial. (Tr. 842, 844.) He denied that he attempted to

rob Thomson and Zemaitis or the Railex Corporation, that he had a rifle or that he threw a rifle at

the police car. (Tr. 848-49.)

### C. Jury Deliberations

Jury deliberations began on November 7, 2005. During the third day of deliberations, the

jury sent the court a note that read: "One juror refuses to communicate. He/she chooses not to

talk or listen. Please give us direction." (Tr. 1031.) After conferring with counsel, the court

brought the jurors into the courtroom and reminded them of their "oaths as trial jurors to try this

case in a just and impartial manner and to render a verdict according to the law and evidence."

(Tr. 1032.) The court urged them to follow his instructions, emphasizing specifically that:

> part of your duties as a juror is to share your views with one another, to
> collectively determine the issues of fact in this case. No one's view is superior to
> anyone else's. However, you are a body. You are here collectively to determine
> the responsibilities that I have given you in this trial.

(Id.) The jury was then sent back to continue deliberations.

Sometime later, the court received a note from a juror stating: "I juror Number 7 would

like to speak to the judge in private." (Tr. 1033.) Juror Number 7, Sherry Winston, was brought

into the courtroom and informed that she could not speak with the court in private or discuss the

substance of the deliberations but that could speak to "other concerns about the conduct of

deliberations or whatever" in the presence of the parties. (Tr. 1034.) Winston indicated that her

6

concern had to do with "the actual content and substance of the deliberations" and that she had nothing else she wished to express. The court accordingly sent her back to the jury room to continue deliberations. (Tr. 1035.)

Winston later sent a second note to the court that read: "I believe that some jurors are trying to change my decision on how I feel. What do I do." (Tr. 1036.) The court stated that it could not "tell from this language if we're talking about proper attempts to persuade or improper duress" and thus "intend[ed] to ask her what's on her mind." (Id.) After consulting with the parties, the court decided that it would "begin exploring this" issue with Winston "and if it appear[ed] initially that there's no indication of duress" it would end the inquiry. If, however, the court's inquiry started "to sound like duress," it would "have to hear the rest of it." (Tr. 1037.) Although initially hesitant, defense counsel agreed with the court's proposed inquiry stating that "if it turns out that is not undue pressure . . . [t]hen she'll have to go back and deliberate." (Tr. 1038.)

When asked what her note meant, Winston began by stating: "They're getting angry and they're calling me prejudice[d]." (Id.) When the court asked how many jurors were angry, she responded that "there's four that kind of agree with me but they're kind of being influenced by other people so I'm the one that's not – you know, I don't agree so everybody's kind of upset." (Tr. 1039.) To the court's questions regarding why she thought the other jurors were angry, Winston first stated that "[w]e're yelling back there" and then clarified that it "is more like well come on let's discuss it. Come on let's discuss but I'm saying is I gave you my opinion but they don't want to hear that. They want me to go over to their side and is something in my – I just can't." (Id.) Asked whether she had "been expressing [her] opinion," she responded:

> Yes, yes, but they're trying to get me to change over and I can't. Since I won't do it they're all angry at me. We don't want to. You know, they're more like you

7

know, well, you don't want to hear it. You're prejudice. You don't want to hear our side. You don't want to discuss this. You shouldn't be here. Get the alternate juror.

(Tr. 1039-40.)

Turning to Winston's mention of "prejudice," the court next inquired about what had "been said that involves prejudice." She answered: "Well, one person had made a statement that, you know, let's just say he's guilty so we can go home. I don't think that's fair." She stated further that the statement was made "before they even heard the case." When asked how the statement had come up before deliberations had started, she responded: "Because everybody's getting tired and they want to go home." She added that the statement had been made sometime the previous week. (Tr. 1040-41.) Prompted by the court to indicate "anything else that was said that involves prejudice as you put it," Winston stated that:

[A]nother juror had made a statement um, well, I know your kind, you know. He said um, well, I know their kind. They're really smooth, you know, so don't believe them and I thought that was a racist remark. So they're saying these things to get the other jurors to come on their side and I think [that] is wrong.

(Tr. 1041-42.) The court then directed her to return to the jury room.

Once Winston had left, defense counsel argued that "in light of what was said we ought to find out who it was that indicated he believed the defendant to be guilty even before evidence was proferred [sic]." (Tr. 1042.) The prosecutor, however, countered that the fact that Winston was coming forward only now when she "clearly wishes to cease deliberation" despite the court's instructions to report any premature discussion immediately "certainly bears upon . . . the credibility of Miss Winston's statement." (Tr. 1042-43.) The prosecutor asserted in addition that Winston's description of the other jurors' statements indicated "an attempt by the other jurors to address the merits of each of their arguments" and not "undue duress." (Tr. 1043.)

8

With respect to Winston's second statement about prejudice, defense counsel argued that since Winston was black, the comment that "I know your kind" was "in fact, a prejudicial statement." (Tr. 1044.) The prosecutor disagreed, contending that Winston had said "I know their kind," a statement that, according to the prosecutor, did not "address the issue of race at all" and was only perceived by Winston as racist. (Id.)

The court expressed concern with the allegation of improper predeliberation discussion among the jurors but noted that it could not "make a determination of this matter solely on the credibility of Ms. Winston." With respect to the allegedly racially prejudicial remark, the court stated that it thought the prosecution's "recital of the quote regarding they're so smooth [wa]s accurate" and that "it might be equivocal in nature." (Tr. 1044.) The court then laid out three possible courses of action: (1) they could let the jury continue to deliberate with the risk that the verdict would be "tainted"; (2) they could "call out each juror now individually and speak to them regarding these allegations," which "might further polarize everyone because everyone will know exactly what started this inquiry; or (3) they could agree to a mistrial. (Tr. 1045.) Agreeing with the court that individualized questioning of the jurors would "only further polarize them," the prosecutor argued that any inquiry should be made after the jury reached a verdict. (Tr. 1045-48.) Defense counsel, meanwhile, argued that "something has to be done now at this point before they reach a verdict." (Tr. 1048.)

Concluding that allowing deliberations to "continue and to have a guilty verdict that might be tainted" would be "pointless," the court determined that the alleged juror quote "let's find him guilty so we can go home" warranted individual inquiry. (Tr. 1048-49.) Regarding the second issue, the court found that the purported statement "I know their kind. They're so smooth. I don't believe them" was sufficiently "of an equivocal nature . . . to avoid an inquiry," which

9

would "simply exacerbate and polarize the process even more." (Tr. 1048.) In declining to make an individualized inquiry on this issue, the court observed that the jury was "mixed" and "diverse," including men and women "from every background," and that "[w]ithout more in that statement, I don't find it on its face to be an impermissibly and reprehensible racist comment." (Tr. 1049.)

Despite defense counsel's suggestion that the court first ask Winston to identify the juror who had made the prejudgment comment, the court proceeded to ask each juror, except Winston, one at a time whether he or she or any of the other jurors had "said words to the effect let's find him guilty so we can go home" prior to the start of deliberations. (Tr. 1050-60.) The court declined to inquire whether the statement had been made during deliberations. (Tr. 1051.) Each juror responded that he or she had neither said nor overheard any such statement. (Tr. 1050-60.) The court also noted on the record the apparent race and gender of the first eleven jurors, which indicated "a diversity of the jury as to racial and ethnic considerations," as well as by gender.[2] (Tr. 1060.) Taken together, the court stated that it did not "find misconduct in the course of these deliberations at this point." (Id.)

Defense counsel, at this point, reiterated that he believed that the court should have "narrow[ed] the focus on the particular juror and have Miss Winston identify the juror" and contended that "the questions could have been a little more pointed." (Tr. 1061.) Boston then addressed the court himself, stating that "I was given a fair trial to pick jurors of my peers and I wasn't able to and I had 15 strikes to pick whoever I want." He claimed in addition that although his challenges were all against Caucasian prospective jurors, the prosecutor had "struck the

---

[2] Of the first eleven jurors, the court determined that seven jurors were Caucasian, one juror was "east Indian, Asian," two jurors were African American, and one juror was South Asian. The court also noted that seven jurors were men, and four jurors were women. The court did not put anything on the record regarding the twelfth juror, Miss Ortega. (Tr. 1050-60.)

majority of the black jurors" and was able to pick mostly Caucasian jurors, a situation that he protested as unfair. (Tr. 1062-63.)

The court then brought all the jurors back to the courtroom and reminded them again of their oaths as jurors "to try this case in a just and impartial manner" and to render a verdict "according to the evidence and the law." They had, the court reiterated, a "responsibility to deliberate fairly and impartially," to share their views and respect others' views and to vote "according to [the court's] instructions regarding the law and the evidence." The court then asked them "to continue, please, the deliberations in due conscious[ness] and in good faith." (Tr. 1064.) After the jury had left the courtroom, defense counsel objected to the court's instructions, stating that the court should have stated that "jurors have to communicate between jurors to reach a verdict but no one has to compromise their own beliefs . . . , because of the fact that there's a majority on the other side or the late hour." (Id.) The court "noted" defense counsel's exception, but indicated that it was unnecessary because he had "continuously" referred the jury back to his "previous instructions in which all those principles were cited and recited." (Tr. 1065.)

### D. The Verdict

After further deliberation, including a denied request for a hardcopy of the transcript of Boston's testimony, the jury returned with a verdict later that afternoon. (Tr. 1066-67.) The jury acquitted Boston of two counts of attempted second-degree murder and two counts of second-degree criminal possession of a weapon, but convicted him of two-counts of first-degree attempted robbery, second-degree attempted robbery, two counts of third-degree criminal possession of a weapon, and one count of first-degree reckless endangerment. (Tr. 1068-69.)

When the court polled the jury, all of the jurors, including Winston, affirmed the verdict. (Tr. 1071-72.)

### E. Sentencing

On December 14, 2005, Boston appeared for sentencing. At the outset, defense counsel made two requests. First, he requested that "the wording attempted murder, two counts" be redacted from the presentence investigation report. He argued that "there's no question [Boston] was convicted of certain crimes" but that the mention of the attempted murder charges would "prejudice the defendant." (S Tr. 2-3.) The court denied the request, stating that Boston's probation report correctly indicated "the original charges and the final charges under which he was convicted," which is "as it is in every probation report." (S Tr. 3.) Second, defense counsel sought to have a victim statement in the report that indicated that Boston had attempted to kill him excised, a request the court also denied. (S Tr. 3-4.) Over defense counsel's objection the prosecutor then read a statement from Thomson, who did not personally attend the sentencing, which asked the court to impose the maximum sentence. (S Tr. 6.)

The prosecutor and defense counsel then addressed the court. The prosecutor, pointing to the seriousness of the crime, defendant's willingness to use deadly force, and other factors, recommended that the court impose the maximum sentence. Defense counsel argued for the minimum sentence, relying largely on the fact that Boston was only nineteen at the time of the crime and had no criminal history. (S Tr. 7-12.) Boston subsequently made a statement, apologizing to the victims but maintaining his innocence, asserting that he should not receive the maximum penalty. (S Tr. 13-14.) Before imposing the sentence, the court stated that he thought Boston "owe[d] some gratitude for the jury for its exercise of mercy involving the most serious charges which were attempted murder in the second degree under two counts under which you

could have been sentenced up to 25 years." However, "the remaining charges," the court observed, were "extremely serious." Indeed, the court remarked:

> I've been a judge more than 20 years. I have heard many charges involving attempts but this is probably among the most serious of those attempted crimes that I ever heard and that is that the law condemns incomplete crimes that come within dangerous proximity to conclusion. This came very close to the conclusion and the danger to the community and to the victims was greater than many completed crimes of a similar nature and I refer to the multiple shots here, the fact a cop was injured. Fortunately there were no bystanders or victims injured, but this came very close to being a very tragic event.

(S Tr. 14-15.) The court also pointed out that the crime "was obviously planned and there was calculation here" and that the incident involved "heavy weapons," vehicles, and "multiple accomplices." (S Tr. 15.) All of these factors, the court determined, were "highly aggravating in nature." Accordingly, the court sentenced Boston to determinate twelve-year prison terms for each first-degree attempted robbery count, a determinate five-year prison term for the second-degree attempted robbery count, determinate five-year prison terms for each of the third-degree criminal possession of a weapon counts, and an indeterminate two to six-year prison term for the first-degree reckless endangerment count. All terms were set to run concurrently. (S Tr. 15-16.)

## II. Direct Appeal

Boston timely appealed his conviction to the Appellate Division, Second Department, asserting four claims. He contended that (1) he was deprived of due process, equal protection and his right to a jury of his choosing when the court granted the prosecution's reverse-Batson challenge and seated two white jurors who were crime victims and/or had connections to law enforcement; (2) his "fundamental right to an impartial jury" was violated when, despite evidence that jurors had expressed a racial bias against him and a black juror, the court refused to inquire into the issue; (3) the court erred when it refused to list "not guilty" before "guilty" on the verdict sheet; and (4) his sentence was excessive for his first arrest and in light of his age and

13

was imposed after the court considered improper factors, "including counts that [Boston] was acquitted of and the unsubstantiated 'fact that a cop was injured'" (App. Br. at 56-57).

On June 17, 2008, the Appellate Division affirmed Boston's conviction. People v. Boston, 858 N.Y.S.2d 910 (App. Div. 2d Dep't 2008). The Appellate Division held first that the trial court "did not improperly grant the People's reverse-Batson application." Specifically, the Appellate Division noted that the trial court's "conclu[sion] that the facially race-neutral reasons proffered by [Boston's] counsel to explain the two peremptory challenges in question were pretextual" was "based upon its credibility assessment." That determination was therefore "entitled to great deference on appeal" and not to "be disturbed where, as here, it is supported by the record." Id. at 911. The Appellate Division then determined that Boston's sentence "was not excessive" and found his remaining contentions "without merit." Id.

On November 19, 2008, the New York Court of Appeals denied leave to appeal the Appellate Division's affirmance of his judgment of conviction. People v. Boston, 11 N.Y.3d 853 (N.Y. 2008).

### III. Writ of Error Coram Nobis

In June 2009, Boston, proceeding pro se, filed a writ of error coram nobis in the Appellate Division, Second Department, claiming that his appellate counsel provided ineffective assistance by failing to adequately challenge the trial court's reverse-Batson ruling on appeal. Specifically, Boston claimed that his appellate counsel failed to: (1) "present to the state court the ethnic statistical composition of the prospective jurors," and (2) argue that the trial court and prosecutor had not sustained their burden of "compiling an adequate statistical record to support" the trial court's ruling. (Coram Pet. at 13.) In a decision and order dated October 27, 2009, the Appellate Division denied Boston's coram nobis application, stating that Boston had "failed to

14

establish that he was denied the effective assistance of appellate counsel." <u>People v. Boston</u>, 886 N.Y.S.2d 816 (App. Div. 2d Dep't 2009). The Court of Appeals denied leave to appeal on March 18, 2010. <u>People v. Boston</u>, 14 N.Y.3d 797 (N.Y. 2010).

## IV. Federal Habeas Petition

Boston subsequently filed this timely petition for a writ of habeas corpus. In his petition and attached affidavit, Boston claims that: (1) the trial court's reverse-<u>Batson</u> ruling violated his due process and equal protection rights; (2) he was denied his "fundamental right to an impartial jury . . . when a juror had expressed racial animus towards [him] and another juror and the court did not conduct an inquiry thereon"; (3) the sentencing court's reliance on improper information and consideration of a charge of which he had been acquitted violated his due process rights[3]; and (4) his appellate counsel provided ineffective assistance by insufficiently challenging the trial court's <u>Batson</u> ruling on appeal. Boston also requested that the Court "assign counsel because of the highly complex nature of litigating a <u>Batson</u> claim." (Pet. 11, ¶ 14.)

## DISCUSSION

## I. Appointment of Counsel

"[I]t is well settled in the Second Circuit and elsewhere that 'there is no constitutional right to representation by counsel in habeas corpus proceedings.'" <u>Green v. Abrams</u>, 984 F.2d 41, 47 (2d Cir. 1993) (quoting <u>United States ex rel. Wissenfeld v. Wilkins</u>, 281 F.2d 707, 715 (2d Cir. 1960)). A court may, however, in its discretion appoint counsel to those who are "financially eligible" where "the interests of justice so require." 18 U.S.C. § 3006A(a)(2); <u>see</u> <u>Pruitt v. Brown</u>, No. 08-CV-01495, 2011 WL 3555829, at *6 (E.D.N.Y. Aug. 9, 2011).

---

[3] In his petition, Boston states that as a result of the sentencing court's improper considerations, he "was denied due process, equal protection, and subject to cruel and unusual punishment." However, in his traverse, Boston clarifies that "[t]he articulated claim on habeas review is strictly a Due Process claim at sentencing." (Traverse at iii.)

A habeas petitioner's request for counsel is analyzed under the same framework as any other application for counsel in a civil case. See Pruitt, 2011 WL 3555829, at *6. When deciding whether to request counsel for an indigent civil litigant under 28 U.S.C. § 1915(e)(1), the court "ask[s] first whether the claimant has met 'a threshold showing of some likelihood of merit.'" Johnston v. Maha, 606 F.3d 39, 41 (2d Cir. 2010) (quoting Cooper v. A. Sargenti Co., 877 F.2d 170, 174 (2d Cir. 1989)); see also Hodge v. Police Officers, 802 F.2d 58, 61 (2d Cir. 1986) ("In deciding whether to appoint counsel, [a] district [court] should first determine whether the indigent's position seems likely to be of substance."). Indeed, "[e]ven where the claim is not frivolous, counsel is often unwarranted where the indigent's chances of success are extremely slim." Hodge, 802 F.2d at 60 (quoting Maclin v. Freake, 650 F.2d 885, 887 (7th Cir. 1981) (internal quotation marks omitted).

Where the petitioner meets this threshold merit showing, the Court then considers other factors, including:

> the indigent's ability to investigate the crucial facts, whether conflicting evidence implicating the need for cross-examination will be the major proof presented . . . , the indigent's ability to present the case, the complexity of the legal issues and any special reason in that case why appointment of counsel would be more likely to lead to a just determination.

Id. at 61-62; see also Johnston v. Maha, 606 F.3d at 41-42.

Other than his general assertion that "the highly complex nature of litigating a Batson claim" warrants the appointment of counsel, Boston fails to explain why the appointment of counsel would increase the likelihood of a "just determination" in this case. (Pet. 11, ¶ 14.) He has provided no facts to support his contention that he requires counsel to assist him in articulating his challenge to the trial court's reverse-Batson ruling or any of the other claims presented here. Indeed, Boston has demonstrated that he has the ability to present his claims,

either alone or with unstated assistance, and has not encountered marked difficulties in doing so. His properly filed submissions have been presented with care and set forth relevant facts and legal arguments adequately and competently. The reverse-Batson challenge for which Boston specifically seeks the assistance of counsel, moreover, is neither novel nor particularly complex. Accordingly, Boston's request for the appointment of counsel is denied.

## II. Habeas Claims

### A. Standard of Review

Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), a state prisoner may petition for "a writ of habeas corpus . . . only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Where the petitioner seeks review of a claim "adjudicated on the merits in State court proceedings," AEDPA "imposes a highly deferential" standard of review. Jones v. Murphy, 694 F.3d 225, 234 (2d Cir. 2012) (citing Hardy v. Cross, 132 S. Ct. 490, 491 (2011)); see 28 U.S.C. § 2254(d). A state court is presumed to have adjudicated a federal claim on the merits when the claim "has been presented to a state court and the state court has denied relief . . . in the absence of any indication or state-law procedural principles to the contrary." Harrington v. Richter, 131 S. Ct. 770, 784-85 (2011).

A district court applying AEDPA deference may grant an application for a writ of habeas corpus only where the state proceedings resulted in a decision that (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)-(2); see also Williams v. Taylor, 529 U.S. 362, 405-06 (2000); Evans v. Fischer, 712 F.3d 125,

132-33 (2d Cir. 2013). "'[C]learly established Federal law' refers to holdings, and not dicta, of cases decided by the Supreme Court, as opposed to lower federal courts." Fischer, 712 F.3d at 133 (citing Williams, 529 U.S. at 412). A state court's ruling on the merits is "contrary to" clearly established Supreme Court holding if it "arrives at a conclusion opposite to that reached by th[e] Court on a question of law or . . . decides a case differently than th[e] Court has on a set of materially indistinguishable facts." Williams, 529 U.S. at 412-13. An "unreasonable application" of clearly established Supreme Court precedent occurs when "the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. "An application of law is 'unreasonable' only if it involves '[s]ome increment of incorrectness beyond error.'" Fischer, 712 F.3d at 133 (quoting Overton v. Newton, 295 F.3d 270, 277 (2d Cir. 2002)); Schriro v. Landrigan, 550 U.S. 465, 473 (2007) (noting that whether a state court's determination was unreasonable is "a substantially higher threshold" than whether that determination was incorrect). AEDPA also requires a district court to "presume the correctness of state courts' factual findings unless applicants rebut this presumption with 'clear and convincing evidence.'" Schriro, 550 U.S. at 473-74 (citing 28 U.S.C. § 2254(e)(1)); Epps v. Poole 687 F.3d 46, 50 (2d Cir. 2012).

## B. Trial Court's Reverse-Batson Ruling

Boston raises two claims related to the trial court's granting of the prosecution's reverse-Batson motion. First, he challenges directly the trial court's reverse-Batson ruling as a denial of his Sixth and Fourteenth Amendment rights. Relatedly, he also argues that his appellate counsel provided ineffective assistance by insufficiently challenging the trial court's reverse-Batson

ruling on appeal. Because the Appellate Division rejected both claims on their merits, these state court determinations are entitled to AEDPA deference. See 28 U.S.C. § 2254(d).

### 1. Challenge to the trial court's reverse-_Batson_ ruling

Boston claims that the trial court's decision to grant the prosecution's reverse-Batson motion and seat two jurors over his peremptory challenges violated his due process and equal protection rights as well as his right to a jury of his own choosing. Specifically, he argues that the trial court ruling was an unreasonable application of the Supreme Court's decision in Batson v. Kentucky, 476 U.S. 79 (1986), because (1) the prosecution never established a prima facie case of discrimination; (2) relatedly, the trial court never made a statistical comparison of the percentage of Caucasian jurors struck and the percentage of their representation on the jury and in Queens County; and (3) even though Boston had offered race-neutral explanations for his challenges, in asking him to show "articulated bias," the trial court appeared, improperly, to require more.

As the Supreme Court has made clear, "racial discrimination in jury selection offends the Equal Protection Clause." Id. at 85. This principle applies equally to prosecutors and criminal defendants, prohibiting either "from engaging in purposeful discrimination on the ground of race in the exercise of peremptory challenges." Georgia v. McCollum, 505 U.S. 42, 59 (1992); Batson, 476 U.S. at 88. "An accusation by the Government that defense counsel has engaged in such discriminatory conduct has come [to] be known as a 'reverse-Batson' challenge." United States v. Thompson, 528 F.3d 110, 115 (2d Cir. 2008). To the extent that Boston's claim here stems from the trial court's application of Batson in its reverse form, it thus touches on a federal concern.

Nevertheless, the exact issue here does not implicate the constitutional concerns raised in

19

either <u>Batson</u> or its progeny. A challenge to a successful reverse-<u>Batson</u> motion is largely the same as a claim for the wrongful loss of a peremptory challenge. <u>See Garcia v. Graham</u>, No. 07-CV-3790, 2008 WL 2949383, at *7 (E.D.N.Y. July 31, 2008); <u>Ramirez v. Poole</u>, No. 03-CV-5202, 2005 WL 1123775, at *4-5 (E.D.N.Y. May 9, 2005). "When a defendant is deprived of the right to exercise a peremptory challenge," however, "that action does not violate a defendant's federal rights." <u>Minton v. LaValley</u>, No. 10-CV-5140, 2012 WL 1646889, at *3 (S.D.N.Y. May 10, 2012). As the Supreme Court has stated:

> [P]eremptory challenges are not constitutionally protected fundamental rights; rather, they are but one state-created means to the constitutional end of an impartial jury and a fair trial. This Court repeatedly has stated that the right to a peremptory challenge may be withheld altogether without impairing the constitutional guarantee of an impartial jury and a fair trial.

<u>McCollum</u>, 505 U.S. at 57. "Because peremptory challenges are within the States' province to grant or withhold, the mistaken denial of a state-provided peremptory challenge does not, without more, violate the Federal Constitution." <u>Rivera v. Illinois</u>, 556 U.S. 148, 158 (2009). Rather, so long as "a defendant is tried before a qualified jury composed of individuals not challengeable for cause, the loss of a peremptory challenge due to state court's good faith error . . . is a matter for the State to address under its own laws." <u>Id.</u> at 157. Because such a loss is "does not violate a defendant's federal rights," it cannot, by extension, form the basis of relief on federal habeas review. <u>See Minton</u>, 2012 WL 1646889, at *3; <u>Boone v. Smith</u>, No. 07-CV-4630, 2010 WL 1438112, at *1 (E.D.N.Y. Apr. 5, 2010).

Viewed as a challenge to the trial court's allegedly improper denial of two peremptory challenges, Batson's reverse-<u>Batson</u> claim here is thus not a viable constitutional claim cognizable on habeas review. Boston admits in his petition that neither Scacalossi nor Weber, the two jurors seated over Boston's peremptory challenges, was challengeable for cause. As he asserts in objecting to the trial court's inquiry as to whether the challenged jurors expressed any

20

"articulated bias," "[i]f the juror was so ardently biased, then a 'for cause' challenge would have been lodged and not a peremptory challenge." (Pet. at 25.) This admission puts into focus the main defect in his claim: to the extent Boston believed that the seating of jurors who had close relationships or associations with police officers and past experience as crime victims amounted to a violation of constitutional dimensions, he was free to challenge those jurors for cause, an action he declined to take. Thus, as a defendant "tried before a qualified jury composed of individuals not challengeable for cause," Boston's loss of two peremptory challenges is, at best, a "mistaken denial of a state-provided peremptory challenge," to be addressed by the State under its own law. Rivera, 556 U.S. at 157.

In any event, even if Boston's reverse-Batson challenge were cognizable here, that claim would fail. Boston argues that the trial court not only erred in applying the first two steps of the Batson inquiry, but also erroneously and unreasonable determined that his peremptory challenges were "motivated by racial animus." None of these arguments are persuasive.

A court evaluating a reverse-Batson challenge applies a three-part test:

> First, the [moving party] must make out a prima facie case by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose. Second, once the [moving party] has made out a prima facie case, the burden shifts to the [non-moving party] to explain adequately the racial exclusion by offering permissible race-neutral justifications for the strikes. Third, [i]f a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination."

Johnson v. California, 545 U.S. 162, 168 (2005) (internal citations and quotation marks omitted).

Attacking the application of step one, Boston first argues that despite the trial court's ruling to the contrary, the prosecution did not establish a prima facie case of discrimination. Specifically, he points out that the trial court erroneously made this determination without adequately considering the ethnic composition of the venire even after defense counsel protested

that "most of the prospective jurors are Caucasians." (Tr. 217.) Once defense counsel objected, Boston contends, the burden shifted to the prosecutor to refute the claim and to the trial court to construct a proper record—a burden neither met. (Pet. at 26-28.)

To state a prima facie claim of discriminatory challenges, the moving party must show "that the totality of the relevant facts gives rise to an inference of discriminatory purpose," including a "pattern of strikes" against jurors of a particular race. Batson, 476 U.S. at 94, 97. However, because the trial court proceeded to the second and third steps of the of reverse-Batson test, whether or not a prima facie case was properly established is not at issue here. McKinney v. Artuz, 326 F.3d 87, 98 (2d Cir. 2003) ("The Supreme Court has held that the prima facie case of discriminatory intent becomes irrelevant to the analysis of a peremptory challenge once the trial court proceeds to the second and third steps as it did here."); Hernandez, 500 U.S. 352, 359 (1991) ("Once [the non-moving party] has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the [moving party] had made a prima facie showing becomes moot."). Thus, even if the trial court had somehow erred in finding that the prosecution had established a prima facie case, that error "was rendered academic, raising no issue of constitutional dimension." Parnell v. Lape, 791 F. Supp. 2d 319, 327 (E.D.N.Y. 2011); Munoz v. United States, No. 07-CV-2080, 2008 WL 2942861, at *40 (E.D.N.Y. July 28, 2008) (in reviewing Batson ruling, finding that although there was a "substantial question" as to whether a prima facie case of discrimination was established, that question was rendered moot once the trial court demanded a race-neutral explanation for the challenged strike).

With respect to step two, Boston claims that the trial court improperly required defense counsel to provide not just a race-neutral explanation for striking Scacalossi and Weber, but

rather a heightened showing of "articulated bias." (Pet. at 25.) As Boston correctly points out, to satisfy this step, a race-neutral reason need only lack an inherently discriminatory intent; it need not be persuasive or even plausible. See Rice v. Collins, 546 U.S. 333, 338 (2006) (citing Purkett v. Elem, 514 U.S. 765, 767-768 (1995)). There is no indication in the record, however, that the trial court applied a more stringent requirement; instead, the judge asked whether Scacalossi had "expressed any bias" only in order "to make sure that [he] consider[ed] everything." (Tr. 219.) Because Boston's reverse-Batson claim was dismissed on the merits, the state court is entitled to AEDPA deference. Boston has not overcome this deference and his claim that trial judge misapplied the second step of the reverse-Batson test fails.

The crux of Boston's reverse-Batson claim is that the trial court's ultimate conclusion that his race-neutral explanations were pretextual was erroneous. Defense counsel offered, as his race-neutral explanation, that Scacalossi had been a victim of crime and was related to law enforcement officials. (Pet. at 25). With regard to Weber, it was noted that he had a nephew who had just become a police officer and, as a city sanitation employee, "that loyalty of all city employees in uniform." (Tr. 223.) Boston asserts that these reasonable and race-neutral explanations along with the ethnic composition of the venire and the fact that the case against him relied mainly on police testimony together constitute "clear and convincing evidence [that] the trial court's factual finding that [his] peremptory strikes were racially motivated was erroneous." (Pet. at 25-28.)

The Court is not persuaded that Boston has overcome the AEDPA deference afforded the state court's determination. On direct review of a Batson ruling, a trial court's evaluation of a race-neutral explanation is "ordinarily entitled to great deference," Jordan v. Lefevre, 206 F.3d 196, 200 (2d Cir. 2000), since that question often turns on the court's assessment of counsel's

demeanor and credibility, which "lies 'peculiarly within a trial judge's province,'" Hernandez, 500 U.S at 365 (quoting Wainwright v. Witt, 469 U.S. 412, 428 (1985)). See Rice, 546 U.S. at 338 ("On direct appeal in federal court, the credibility findings a trial court makes in a Batson inquiry are reviewed for clear error."). When, as here, a state trial court's determination is questioned on habeas review, AEDPA sets the bar even higher: "a federal habeas court must find the state-court conclusion 'an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" Id. at 338 (quoting § 2254(d)(2)). Thus, Boston's habeas petition succeeds only if the Court were to find that the state court acted unreasonably, i.e., only if the record "compel[s] the conclusion that the trial court had no permissible alternative" but to accept Boston's race-neutral justifications. See id. at 338, 341. Boston fails to make this difficult showing.

The Appellate Division determined that the trial court's decision to sustain the reverse-Batson motion and seat Scacalossi and Weber is sufficiently supported by record evidence. The record indicates that defense counsel employed his peremptory challenges exclusively against Caucasian prospective jurors. (Tr. 213-14, 216-17.) The trial judge noted that defense counsel, despite articulating a race-neutral reason for striking Scacalossi and Weber, declined to strike other jurors possessing similar characteristics. (Tr. 219-25.) After reviewing the record, this Court cannot find that the Appellate Division's determination to sustain the trial judge's decision to seat Scacalossi and Weber was unreasonable.

Accordingly, the Court concludes that, the trial court's reverse-Batson ruling, and the Appellate Division's affirmance, was fairly supported by the record and not unreasonable under "clearly established Federal law." 28 U.S.C. § 2254 (d)(1).

## 2. Ineffective assistance of appellate counsel

In a related claim, Boston argues that deficiencies in his appellate counsel's challenge to the trial court's reverse-Batson ruling violated his Sixth Amendment right to effective assistance of counsel. The grounds on which this claim is based are essentially identical to those raised in his coram nobis application, namely that in challenging the trial court's reverse-Batson ruling, his appellate counsel did not: (1) specify the racial makeup of seated jurors and the venire; (2) argue that the prosecutor failed to sustain her burden of proof; or (3) claim that the trial court failed to consider the "ethnic statistical composition of the prospective jurors" in deciding the reverse-Batson motion. (Pet. 4, 10, 28-35.) The Appellate Division's denial of Boston's coram nobis application on the grounds that Boston "failed to establish that he was denied the effective assistance of appellate counsel," Boston, 886 N.Y.S.2d at 816, represents an adjudication on the merits and is thus entitled to AEDPA deference.

"'[A] Sixth Amendment ineffective assistance of counsel claim necessarily invokes federal law that has been 'clearly established' by the Supreme Court within the meaning of AEDPA.'" Ramchair v. Conway, 601 F.3d 66, 73 (2d Cir. 2010) (quoting Mosby v. Senkowski, 470 F.3d 515, 518-19 (2d Cir. 2006)). The framework articulated in Strickland v. Washington, 466 U.S. 668 (1984), guides the analysis of such claims. To prevail on an ineffective assistance of counsel claim under Strickland, the petitioner must demonstrate "(1) that his counsel's performance was deficient, and (2) 'that the deficient performance prejudiced the defense.'" Hemstreet v. Greiner, 491 F.3d 84, 89 (2d Cir. 2007) (quoting Strickland, 466 U.S. at 687)). This framework applies to claims of ineffective assistance of appellate as well as trial counsel. See Ramchair, 601 F.3d at 73.

25

Under Strickland's deficiency prong, the petitioner must show that counsel's representation "fell below an objective standard of reasonableness" as measured by "prevailing professional norms," Strickland, 466 U.S. at 688, and "'evaluated from counsel's perspective at the time of the alleged error,'" United States v. Pitcher, 559 F.3d 120, 123 (2d Cir. 2009) (quoting Kimmelman v. Morrison, 477 U.S. 365, 381 (1986)). In considering whether a petitioner has met this deficiency prong, courts must be "highly deferential" to counsel's performance and "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 689. Thus, a court must "not normally fault counsel for foregoing a potentially fruitful course of conduct if that choice also entails a significant potential downside," or if the lawyer otherwise had "a reasonable justification for the decision." Greinder v. Wells, 417 F.3d 305, 319 (2d Cir. 2005) (internal quotation marks omitted).

To establish Strickland's second prong, the petitioner must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding"; rather, "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 693-94.

In this case, Boston's "heavy burden" of showing ineffective assistance of counsel is "enhanced by the added hurdle posed by the highly deferential review accorded state court adjudications under [AEDPA]." Eze v. Senkowski, 321 F.3d 110, 112 (2d Cir. 2003); see also Harrington v. Richter, 131 S. Ct. 770, 788 (2011) ("The standards created by Strickland and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so." (internal quotation marks and citation omitted)). In order to obtain habeas relief, Boston "must

demonstrate that the Appellate Division's application of <u>Strickland</u> was not merely incorrect, but 'objectively unreasonable.'" <u>Hemstreet</u>, 491 F.3d at 89. As stated earlier, "[a]n application of law is 'unreasonable' only if it involves '[s]ome increment of incorrectness beyond error.'" <u>Fischer</u>, 712 F.3d at 133 (quoting <u>Overton v. Newton</u>, 295 F.3d 270, 277 (2d Cir. 2002)).

Applying the <u>Strickland</u> framework through the AEDPA lens, the Court concludes that the Appellate Division's denial of Boston's ineffective assistance of counsel claim based on alleged deficiencies in appellate counsel's challenge to the trial court's reverse-<u>Batson</u> ruling was not an unreasonable application of clearly established law.

Boston claims that his appellate counsel provided ineffective assistance because he failed to: (1) specify the racial makeup of seated jurors and the venire; (2) argue that the prosecutor failed to sustain her burden of proof; and (3) highlight the trial court's failure to consider the "ethnic statistical composition of the prospective jurors." Although they each frame the issue in slightly different ways, these bases for ineffective assistance are all ultimately concerned with the same question: whether a <u>prima facie</u> case of discrimination had been properly established. Boston's ineffective assistance of appellate counsel claim thus reduces to whether appellate counsel was ineffective in not appealing the trial court's reverse-<u>Batson</u> ruling on the grounds that a <u>prima facie</u> case of discrimination had not been properly established. Viewing the claim in this light, it becomes clear why Boston's appellate counsel's failure to raise this issue was neither deficient performance nor prejudicial.

As this Court observed in disposing of Boston's challenge to the reverse-<u>Batson</u> ruling itself, "the prima facie case of discriminatory intent becomes irrelevant to the analysis of a peremptory challenge once the trial court proceeds to the second and third steps as it did here." <u>McKinney</u>, 326 F.3d at 98. In other words, "[o]nce [the non-moving party] has offered a race-

neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the [moving party] had made a prima facie showing becomes moot." Hernandez, 500 U.S. at 359; see also United States v. Brown, 352 F.3d 654, 660 (2d Cir. 2003). Because a reviewing court in these circumstances "does not rule on the sufficiency of the . . . prima facie showing," Ware, 2007 WL 1771583, at *3, any challenge to that sufficiency would be pointless. In fact, the futility of raising these arguments on appeal is a principal reason given by appellate counsel during Boston's coram nobis proceedings for why he chose not to pursue them. (Garvin Coram Nobis Affirm. ¶¶ 8-10.) Accordingly, since appellate "counsel does not have a duty to advance every nonfrivolous argument that could be made," Clark v. Stinson, 214 F.3d 315, 322 (2d Cir. 2000) (quoting Mayo v. Henderson, 13 F.3d 528, 533 (2d Cir. 1994)), and may "winnow[] out weaker arguments on appeal and focus[] on . . . a few key issues," Jones v. Barnes, 463 U.S. 745, 751-52 (1983), Boston's appellate counsel's performance did not fall "below an objective standard of reasonableness" when he chose to forego futile arguments on appeal.

Even if appellate counsel's performance was somehow deficient for failing to pursue these arguments, Boston cannot establish that he was prejudiced by this failure. Since any concerns surrounding the sufficiency of the prima facie showing were rendered moot in this case, these issues, whether raised by appellate counsel or not, have no real substantive impact on the evaluation of the trial court's reverse-Batson ruling.

The Court therefore concludes that the Appellate Division's denial of Boston's claims of ineffective assistance of appellate counsel was not contrary to or an unreasonable application of Strickland.

28

## C. Sixth Amendment Right to a Fair and Impartial Jury

Boston also claims that his right to a fair and impartial jury was violated when the trial court failed to conduct an inquiry regarding alleged racial remarks expressed during deliberations. Specifically, Boston argues that the trial court should have individually questioned each juror regarding the allegations of Sherry Winston, Juror Number 7, that during deliberations another juror stated: "I know your kind . . . . I know their kind. They're really smooth, you know, so don't believe them."[4]  The Appellate Division denied this claim as "without merit," Boston, 858 N.Y.S.2d at 910, an adjudication on the merits that is entitled to AEDPA deference.

Criminal defendants have the right, under the Sixth Amendment, to a "fair trial by a panel of impartial, 'indifferent' jurors." Irvin v. Dowd, 366 U.S. 717, 722 (1961). "The Supreme Court has held that the question of whether jurors have opinions that disqualify them is one of historical fact to which [§ 2254(e)(1)'s] presumption of correctness applies." Garrido-Valdez v. Poole, 384 F. Supp. 2d 591, 597 (W.D.N.Y. 2005); Patton, 467 U.S. at 1037-38 (explaining that the statutory presumption of correctness applies to a trial court's findings of impartiality); see also Fama v. Comm'r of Corr. Servs., 235 F.3d 804, 813 (2d Cir. 2000) ("On § 2254 review, the state trial court is entitled to a presumption of correctness with respect to its conclusion that the jury was impartial."). To rebut this presumption of correctness, the petitioner must come forward with "clear and convincing evidence" of the "actual existence of such an opinion in the mind of the juror as will raise the presumption of partiality." Irvin, 366 U.S. at 723; 28 U.S.C. § 2254(e)(1). In addition to 2254(e)(1)'s presumption of factual correctness, 2254(d)(2) provides that this Court cannot grant Boston's habeas petition unless it determines that the state court's

---

[4] The exact language of the statement that was allegedly made by the anonymous juror is unknown. The statement made by Winston included both "I know your kind" and "I know their kind." The trial court addressed the statement "I know their kind" when reaching its decision to not inquire.

decision of law was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."

Boston's jury bias claim challenges the trial court's determination that Winston's remarks regarding purportedly racist statements made by another juror were too equivocal to warrant individualized inquiry. The trial court's determination not to conduct an individualized investigation of the jurors based on these statements occurred after a fuller colloquy between the trial court and Winston, prompted by the suggestion in Winston's note to the court that she might be under "improper duress." (Tr. 1036.) Initially, Winston described only frustration by the other jurors regarding her position who were "getting angry" and "calling [her] prejudice[d]." (Id.) Only after the trial court pressed her to discuss "anything else that was said that involves prejudice as you put it," did Winston state that:

> [A]nother juror had made a statement um, well, I know your kind, you know. He said um, well, I know their kind. They're really smooth, you know, so don't believe them and I thought that was a racist remark. So they're saying these things to get the other jurors to come on their side and I think [that] is wrong.

(Tr. 1041-42.) The court found this statement sufficiently "equivocal" in nature "to avoid an inquiry," which would "simply exacerbate and polarize the process even more." (Tr. 1048.) In declining to make an individualized inquiry on this issue, the court observed that the jury was "mixed" and "diverse," including men and women "from every background," and that "[w]ithout more in that statement, I don't find it on its face to be an impermissibly and reprehensible racist comment." (Tr. 1049.) Despite not conducting an individualized inquiry, the court did remind the jurors of their oaths as jurors "to try this case in a just and impartial manner" and to render a verdict "according to the evidence and the law." The court reiterated that the jurors had a "responsibility to deliberate fairly and impartially," to share their views and respect others' views and to vote "according to [the court's] instructions regarding the law and the evidence." The

court then asked them "to continue, please, the deliberations in due conscious[ness] and in good faith." (Tr. 1064.)

When confronted by reports of possible juror misconduct or bias, "'[c]ourts face a delicate and complex task whenever they undertake to investigate [those reports] during the course of a trial.'" United States v. Abrams, 137 F.3d 704, 708 (2d Cir. 1998) (quoting United States v. Thomas, 116 F.3d 606, 618 (2d Cir. 1997)). Particularly where, as here, the potential need for an investigation arises during jury deliberations, "any such investigation is intrusive and may create prejudice by exaggerating the importance and impact of what may have been an insignificant incident." Abrams, 137 F.3d at 708. "The district court, which 'observ[es] the jury on a day to day basis . . . is in the best position to sense the atmosphere in the courtroom as no [subsequent reviewing] court can on a printed record.'" Id. (quoting United States v. Barnes, 604 F.2d 121, 144 (2d Cir. 1979)). "In many instances, the court's reiteration of its cautionary instructions to the jury is all that is necessary.'" Id. at 708 (quoting United States v. Thai, 29 F.3d 785, 803 (2d Cir. 1994)).

Boston argues that because the "I know your kind/their kind" statement on its face evidences prejudice, the trial court's determination that the statement was equivocal and thus did not warrant further inquiry was unreasonable. His argument, however, rests mainly on his disagreement with the trial court's interpretation of the statement. Beyond the statement itself, his race, and the race of Winston, Boston offers no evidence, let alone "clear and convincing evidence," of the "actual existence of such an opinion in the mind of [a] juror as will raise the presumption of partiality." See Irvin, 366 U.S. at 723.

As discussed above where, as here, the purported prejudicial nature of the comment was context-dependent, 2254(e)(1) demands that this Court afford great deference to the

determinations made by the state court. Garrido-Valdez, 384 F. Supp. 2d at 597 ("The Supreme Court has held that the question of whether jurors have opinions that disqualify them is one of historical fact to which [§ 2254(e)(1)'s] presumption of correctness applies."). This Court may only upset the state court's determination if Boston provides clear and convincing evidence that the state court erred. Here, the trial court had the opportunity to observe Winston's mannerisms and demeanor over the course of trial and during their colloquy before determining whether her report of bias was ambiguous and potentially a subjective perception of bias only. As he noted on the record, moreover, the trial judge also took under consideration the fact that the jury was "mixed" and "diverse." Having failed to present clear and convincing evidence that the trial judge determination of fact was erroneous, this Court is bound by the state court's determination that the "I know your kind/their kind" statement was equivocal.

Once the trial court judge determined that the statement was equivocal, the judge was then in the best position to determine whether individualized inquiry was appropriate or whether it would further "polarize" the jury given his "sense [of] the atmosphere of the courtroom." Barnes, 604 F.2d at 144. Rather than conduct an individualized inquiry, the trial court took the curative step of reminding the jurors of their oaths to deliberate fairly impartially and to decide based on the law and evidence. The Appellate Court dismissed, on the merits, Boston's claim that the trial court erred by failing to conduct an individualized inquiry. As noted above, 2254(d)(1) provides that a state court's application of law cannot be disturbed unless it was unreasonable. The determination that a decision was unreasonable requires a substantially higher threshold than finding a decision incorrect. Schriro v. Landrigan, 550 U.S. 465, 473

(2007).[5] This Court cannot say that the state court's determination that an individualized inquiry was unnecessary and that the curative step of reminding the jurors of their oaths to deliberate fairly and impartially was unreasonable.

Accordingly, habeas relief as to this claim is denied.

## D. Reliance on "Materially False" Information at Sentencing

Boston claims that in referencing the unsubstantiated "fact that a cop was injured,"[6] the sentencing court relied on materially false information in violation of Boston's Fifth and Fourteenth Amendment rights to due process. Respondent answers that this challenge to his sentencing decision is unexhausted and should be deemed exhausted but procedurally barred and is, in any event, meritless.

### 1. Exhaustion

For a claim to be exhausted, "it must have been 'fairly presented' to the appropriate state appellate court." Jackson v. Edwards, 404 F.3d 612, 618 (2d Cir. 2005) (quoting Picard v. Connor, 404 U.S. 270, 275, 278 (1971)). A claim is "fairly presented" when a petitioner demonstrates that he has informed the appropriate state court of both the factual and legal premises of the claim he now asserts on habeas review. See Daye v. Att'y Gen. of N.Y., 696 F.2d 186, 194 (2d Cir. 1982). To satisfy this requirement, the petitioner need not have cited to

---

[5] None of the cases Boston cites to show that the failure to inquire was an unreasonable application of federal law support this proposition. United States v. Aiello, 771 F.2d 621, 629 (2d Cir. 1985), dictates that a judge must investigate upon learning of an unauthorized communication between a third person and a juror about a case pending before the juror. Here, there was no unauthorized communication by a third person. United States v. Ruggierio, 928 F.2d 1289, 1300 (2d Cir. 1991), involved a juror who felt pressured to vote a certain way because he was visited at his home by two individuals during trial. In United States v. Polouzzi, 687 F. Supp. 2d 133 (E.D.N.Y. 2010), the court addressed the topic of jury nullification, noting that the court can dismiss a juror who is unable to follow the law.

[6] In his petition, Boston states that the sentencing court also improperly relied on a charge of which he was acquitted. (Pet. at 6.) As supporting facts, however, he discusses only the sentencing court's reference to the unsubstantiated "fact that a cop was injured" and his underlying arguments are similarly confined to this issue. (Pet. at 36-37; Traverse at 8-9.) The Court thus understands the sentencing court's reference to an injured cop to be the basis of this habeas claim.

the book and verse of the Constitution and can instead "fairly present" the legal basis of a claim

by a variety of means including through "reliance on state cases employing constitutional

analysis in like fact situations" or the "allegation of a pattern of facts that is well within the

mainstream of constitutional litigation." Daye, 696 F.2d at 194; Jackson, 404 F.3d at 618-19.

In his appellate brief, Boston stated as part of his excessive sentence claim, that the

sentencing court "considered improper factors, including . . . the unsubstantiated 'fact that a cop

was injured.'" (App. Br. at 56-57.) He then cited to the Fifth and Fourteenth Amendments to the

U.S. Constitution as well as to a provision of the New York Constitution. Although "it would be

better practice for counsel when relying on a broad constitutional doctrine like the Fourteenth

Amendment to support the claim with a factual premise and by citation to federal cases,'" where,

as here, the petitioner has stated the factual basis of the claim and then cited to the Fifth and

Fourteenth Amendments, this "minimal reference to the [Fifth and] Fourteenth Amendment[s]

satisfies the exhaustion requirement." Reid v. Senkowski, 961 F.2d 374, 376 (2d Cir. 1992)

(quoting Gonzalez v. Sullivan, 934 F.2d 374, 423 (2d Cir. 1991)); Rodriguez v. Artus, No. 05-

CV-1122, 2008 WL 5113440, at *6 (E.D.N.Y. Nov. 24, 2008) ("No elaborate articulation of the

claim is required; citation to the constitution . . . suffice[s] to alert the state court to the

constitutional claim."); see also Salcedo v. Artuz, 107 F. Supp. 2d 405, 415 (S.D.N.Y. 2000)

("Merely mentioning a constitutional amendment in a point heading fairly presents the

constitutional claim to state courts."). The Court thus concludes that Boston fairly presented his

claim that the sentencing court relied on improper information to the Appellate Division and that

the claim is exhausted.

## 2. Merits

Generally, where, as here, a sentence falls "within the range prescribed by state law," no federal constitutional issue exists. White v. Keane, 969 F.2d 1381, 1383 (2d Cir.1992). "Nevertheless, as Townsend v. Burke, 334 U.S. 736, 168 S. Ct. 1252, 92 L.Ed. 1690 (1948), recognizes, due process requires that a convicted person not be sentenced on 'materially untrue' assumptions or 'misinformation.'" United States v. Pugliese, 805 F.2d 1117, 1123 (2d Cir. 1986). The Second Circuit has held that although the sentencing court's "actual reliance on the erroneous information need not necessarily be shown," there must be some evidence suggesting that reliance on the erroneous information was at least "quite probable." See King v. Hoke, 825 F.2d 720, 724 (2d Cir. 1987); McGee v. United States, 462 F.2d 243, 246 (2d Cir. 1972); McGuire v. Walsh, No. 09-CV-464, 2010 WL 3420629, at *19 (E.D.N.Y. Aug. 26, 2010).

In this case, the sentencing court noted as one "highly aggravating" factor that of the many charges involving attempts that he had heard in his 20 years as a judge, Boston's case was "probably among the most serious." (S Tr. 14.) In describing why Boston's case was so serious, he observed that "[t]his case came very close to the conclusion and the danger to the community and to the victims was greater than many completed crimes of a similar nature and I refer to the multiple shots here, the fact that a cop was injured." (S Tr. 14-15.) The prosecution, however, had presented no evidence at trial that a police officer, was injured during the commission of the crime, a fact that respondent does not dispute (Opp. at 40). That a cop was injured was therefore not properly attributable to the charges of which Boston was convicted. Nevertheless, as respondent points out, the sentencing court then enumerated a number of other considerations that weighed in his sentencing decision, including the fact that the crime was planned and

calculated, that heavy weapons and vehicles were utilized, shots were fired, and that there were multiple accomplices.  (S Tr. 15.)

The Appellate Court dismissed on the merits Boston's challenge to his sentencing. Although Boston's right not to be sentenced based on materially false information is clear, see Townsend, 334 U.S. at 740-41, the state court, in dismissing Boston's sentencing claims, determined that trial court did not rely on any material untrue assumptions or misinformation. Because the state court's determination is entitled to AEDPA deference, this Court cannot disturb the state court's determination unless it finds that the state court determination resulted in a "decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined the Supreme Court of the United States."  See 28 U.S.C. 2254(d)(1).

In Townsend, the trial judge, in sentencing the defendant, relied on the assertion that the defendant had pled guilty to multiple other crimes in the past.  In reality, defendant had been found not guilty on several of the crimes to which the court stated he had pled guilty.  Townsend, 334 U.S. at 739-40.  The Court, in finding a violation of due process, rested its decision on the fact that the judge's sentence "relied on a foundation so extensively and materially false."  Id. at 741.  Similarly, in United States v. Tucker, 404 U.S. 443, 446-47 (1972) the Court found that the sentencing judge violated defendant's due process rights where the judge relied on defendant's two previous unconstitutional convictions and, had the judge known of the previous convictions' infirmity, "the factual circumstances of the respondent's background would have appeared in a dramatically different light at the sentencing proceedings."  Id.

The facts in this case differ substantially from the facts in Townsend and Tucker.  Here, the judge's sentence did not erroneously rely on past convictions or on false facts that, if not viewed, would have presented the defendant in a "dramatically different light."  Instead, the

36

sentencing judge, in addition to mistakenly mentioning that a cop was injured, properly relied on a number of considerations that justified the sentence, including the fact that the crime was planned and calculated, heavy weapons and vehicles were utilized, shots were fired, and there were multiple accomplices. (S Tr. 15.) This Court cannot conclude that the state court's determination that the misinformation the sentencing judge relied on was not materially false was contrary to, or an unreasonable application of, clearly established federal law as interpreted by the Supreme Court.

## CONCLUSION

For the foregoing reasons, Boston's request for the appointment of counsel and his petition for a writ of habeas corpus are both denied. Since Boston has failed to make a "substantial showing of the denial of a constitutional right," a Certificate of Appealability shall not issue. 28 U.S.C. § 2253(c). The Clerk of the Court is directed to enter judgment and to close the case.

SO ORDERED.

Dated: Brooklyn, New York
    February 24, 2014

/S/ Chief Judge Carol B. Amon

Carol Bagley Amon
Chief United States District Judge